2016 JUL 11  AM 3: 43


IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| JACK A. JOHNSON, in his capacity as the trustee of KEY DEVELOPMENT PENSION; f/k/a G & G MEATS PENSION FUND AND COLUMBIA MEAT PRODUCTS PENSION PLAN, <br><br> Appellant, <br><br> v. <br><br> CLYDE E. CARLSON and PRISCILLA A. CARLSON, husband and wife, and the marital community composed thereof, <br><br> Respondents. | No. 73347-8-I <br><br> DIVISION ONE <br><br> UNPUBLISHED OPINION <br><br> FILED: July 11, 2016 |

SCHINDLER, J. — Jack A. Johnson as the trustee of Key Development Pension (Key Development) appeals the trial court's decision that the loans to Clyde E. Carlson and his spouse violated the usury statute, chapter 19.52 RCW. Key Development contends the court erred in concluding it did not meet the burden of proving the loans were exempt from the usury statute as business loans. We disagree, and affirm.

FACTS

Jack A. Johnson, Gary Dahlby, and Clyde Carlson knew each other for many years and were longtime friends. Beginning in the late 1970s until 1994, Johnson and Dahlby owned G & G Meats and formed the G & G Meats Pension Fund. Johnson and

Dahlby were the trustees of the pension fund. Carlson owned a floatplane business in Renton; Northwest Seaplanes Inc. Northwest Seaplanes Inc. is a seasonal business. Northwest Seaplanes Inc. maintained corporate records and bank accounts and filed corporate tax returns

Carlson knew Johnson and Dahlby used the pension fund to make loans. In November 2000, Johnson and Dahlby agreed to loan Carlson $150,000.

On November 10, 2000, Carlson and his spouse Priscilla Carlson executed a promissory note.[1] Carlson and Priscilla agreed to pay G & G Meats Pension Fund the principal sum of $150,000 with interest computed at the rate of 18 percent per annum. The promissory note states, in pertinent part:

> FOR VALUE RECEIVED, Clyde E. Carlson and Priscilla A. Carlson (collectively, "Borrower" herein) promises to pay to the order of G & G MEATS PENSION FUND . . . ("Lender" herein), the principal sum of One Hundred Fifty Thousand and no/100 Dollars ($150,000.00), with interest thereon from the date hereof, computed on monthly balances on the basis of a 360-day year, at the rate of eighteen percent (18%) per annum.

The promissory note states Carlson shall make interest-only payments of $6,750 in July, August, September, and October 2001 with "all accrued and unpaid interest . . . due in full on November 10, 2001." The promissory note gives Carlson the option "to extend the Maturity Date of this Note until November 10, 2002." The obligation for the promissory note is joint and several.

Johnson wrote a check to "Clyde Carlson" for $149,500 on the G & G Meats Pension Fund account. Carlson deposited the check into his personal bank account.

---

[1] We refer to Priscilla Carlson by her first name for purposes of clarity and mean no disrespect by doing so.

At some point after 2000, the G & G Meats Pension Fund changed to the Columbia Meat Products Pension Plan. In April 2002, Johnson and Dahlby agreed to make another loan to Carlson for $150,000.

On April 18, 2002, Carlson and Priscilla executed a promissory note for $150,000. The obligation on the promissory note is joint and several. The loan is due on April 17, 2003. Carlson and Priscilla agreed to pay Columbia Meat Products Pension Plan the principal with interest computed at the rate of 18 percent per annum. The 2002 promissory note states, in pertinent part:

> FOR VALUE RECEIVED, Clyde E. Carlson and Priscilla A. Carlson (collectively, "Borrower" herein) promises to pay to the order of Columbia Meat Products Pension P[l]an . . . ("Lender" herein), the principal sum of One Hundred Fifty Thousand and no/100 Dollars ($150,000.00), with interest thereon from the date hereof, computed on monthly balances on the basis of a 360-day year, at the rate of eighteen percent (18%) per annum.

On April 22, 2002, Johnson wrote a check to "Clyde Carlson" on a corporate account in the amount of $150,000.[2] Carlson deposited the check into his personal bank account.

At some point, the Columbia Meat Products Pension Plan changed to the Key Development Pension.

Carlson made interest-only payments on the loans. The parties agreed multiple times to extend the maturity date for both promissory notes. In 2006, the parties agreed to reduce the interest rate on the notes from 18 percent to 14 percent per annum. In 2009, Johnson agreed to extend the maturity date on the promissory notes to October 2012. Carlson continued to make interest-only payments until October 2010.

---

[2] The corporation is a land development company owned by Johnson.

3

On October 23, 2012, Johnson, as the trustee of Key Development Pension (Key Development), filed a lawsuit against Carlson and his spouse Priscilla (collectively, Carlson) for the amount due on the promissory notes. Carlson asserted as an affirmative defense that the promissory notes violated the Washington usury statute, chapter 19.52 RCW.

Key Development did not dispute the interest rate for the promissory notes exceeded the maximum interest rate allowed by the usury statute but claimed the business purpose exemption applied.

At trial, Key Development did not dispute it had the burden to prove the exemption applied. The parties also stipulated to the admission of copies of the promissory notes, the checks to Carlson for the two loans, Carlson's handwritten interest payment records, the 2000 to 2003 personal tax returns for Carlson, and the 2000 to 2004 corporate tax returns for Northwest Seaplanes Inc.

Dahlby testified that in 2000, Carlson told him he "wanted to borrow some money for — to expand — I don't know about expand, but he wanted to borrow it for the business." Dahlby said that after talking to Johnson, he and Johnson agreed to make a loan to Carlson from the pension fund.

Dahlby also testified that the following year, he loaned Carlson $200,000 to "restart Northwest Seaplanes or something on that order." Dahlby said Carlson repaid the $200,000 loan to him in full.

Johnson testified Carlson contacted him in 2002 about making another loan, and he and Dahlby agreed to loan Carlson $150,000 from the pension fund. According to

4

Johnson:

> A. Well, on that loan I think he contacted me directly, same scenario, was still working on buying planes or doing something with his business, asked if we had more funds that we could loan him.
> Q. And what did you tell him?
> A. We said yeah, we got a hundred and fifty more.

Key Development introduced into evidence copies of the checks for the interest payments Carlson wrote on the account for Northwest Seaplanes Inc. or its subsidiary for the 2000 and 2002 loans. The interest paid on the 2000 promissory note totaled $234,020. The interest paid on the 2002 promissory note totaled $207,750.

During the cross-examination of Johnson, the court admitted evidence about other loans Key Development or Johnson made including promissory notes, deeds of trust, and other documents.

Carlson testified that he did not recall "having a conversation with either Mr. Dahlby or Mr. Johnson about the purpose" of either the 2000 or the 2002 loan. Carlson testified he used the $150,000 from the 2000 loan to purchase an apartment in Campbell River, British Columbia, and to remodel a vacation home in Arizona and in Chelan. Carlson testified he used the $150,000 from the 2002 loan to settle a lawsuit over his father's estate. Carlson testified the timing of the interest-only payments he made using the Northwest Seaplanes Inc. account coincided with the months when his business income was the highest because those were the months he "g[o]t paid."

Certified public accountant Gary Lien testified and the court admitted the report he prepared into evidence. Lien testified he reviewed the 2000 and 2002 promissory notes, the interest payment records on the loans, Northwest Seaplanes Inc. tax returns for the years 2000 through 2008, and Carlson's personal tax returns for the years 2000

through 2003 and 2005 through 2008. Lien testified none of the Northwest Seaplanes Inc. accounting documents reflected either the 2000 or the 2002 loan "as a business liability." Lien testified the corporate tax returns did not include a deduction for the interest payments on the loans. In his opinion, Carlson's use of his business account to write checks to pay the interest on the promissory notes did not necessarily show a business purpose. In the report, Lien states:

> I am not surprised at the fact that many if not all of the monthly payments on the Promissory Notes came from the checking account of the Borrower's business rather than their personal checking account. I have seen that frequently in my years of practice.

The court concluded the interest on the two loans was usurious and Key Development did not carry its burden of establishing the business loan exemption under RCW 19.52.080 applied.

The court found the "testimony of Mr. Carlson, Mr. Johnson, and Mr. Dahlby is not determinative of or convincing regarding the purpose of the funds at the inception of the Loans." The court found the agreement to loan Carlson money was very informal— Johnson and Dahlby did not ask Carlson to provide "documentation of any kind."

The court found the terms of the 2000 and 2002 promissory notes did not indicate that the loans were for a business purpose and the checks for the loan proceeds were written "to Mr. Carlson, not his corporation." The court found that although Johnson believed the loans were for a business purpose, he "controlled the preparation of the loans and used his counsel to prepare" the promissory notes. The court found that unlike other loans made by the pension fund for a business purpose, "[n]either of the Carlson Notes specifies a business or commercial purpose." The court found the interest payments Carlson made using checks drawn on the account of

6

Northwest Seaplanes Inc. did not establish the loans were used for a business purpose. The court concluded the evidence showed the loans to Carlson were personal loans.

> Because the Loans are usurious on their face, Plaintiff has the burden of establishing that the Loans qualify for the exemption under RCW 19.52.080 for loans made "primarily" for "commercial, investment or business purposes" at the time of the inception.
>
> 27.     "[W]hen a loan is usurious on its face, as in the present case, the burden is upon the lender to prove that its loan qualifies for the narrow transaction exemption." "The borrower's intended use for the loan proceeds must be characterized according to the manifestations of intent, if any, that the borrower made to the lender at the time the parties entered into the loan contract." As enumerated in the above findings of fact, the testimony of the parties is neither determinative nor helpful with regard to the purpose of the loans.  The only contemporary documentation are the two notes themselves and the payments of the loan proceeds to borrower. Neither of the Carlson Notes specifies a business or commercial purpose. The Plaintiff paid the loan proceeds to Mr. Carlson personally.  The Plaintiff lender has not carried its burden in proving that these loans qualify for the narrow transaction exemption.[3]

The court entered extensive findings of fact and conclusions of law and a judgment against Key Development for $441,770 plus attorney fees and costs.

## ANALYSIS

Key Development argues the court erred in concluding it did not carry its burden of establishing the loans to Carlson were made for a commercial or business purpose under RCW 19.52.080.

The usury statute, chapter 19.52 RCW, limits the interest rate for consumer loans.  As a general rule, the rate of interest charged on a loan may not exceed 12 percent.  RCW 19.52.020(1).  RCW 19.52.020(1) states, in pertinent part:

> Any rate of interest shall be legal so long as the rate of interest does not exceed the higher of: (a) Twelve percent per annum; or (b) four percentage points above the equivalent coupon issue yield.

---

[3] Alteration in original, footnotes omitted, citations omitted.

A transaction bearing interest above the statutory limit is prima facie usurious and unenforceable.[4] RCW 19.52.030. However, the statutory limit does not apply to commercial loans "primarily for agricultural, commercial, investment, or business purposes." RCW 19.52.080. RCW 19.52.080 states, in pertinent part:

> [P]ersons may not plead the defense of usury . . . if the transaction was primarily for agricultural, commercial, investment, or business purposes: PROVIDED, HOWEVER, That this section shall not apply to a consumer transaction of any amount.
> Consumer transactions, as used in this section, shall mean transactions primarily for personal, family, or household purposes.

A borrower asserting a loan violates the usury statute bears the initial burden to show the loan was usurious. Stevens v. Sec. Pac. Mortgage Corp., 53 Wn. App. 507, 514, 768 P.2d 1007 (1989).

Key Development does not dispute the interest rate on the 2000 and 2002 loans is usurious and it had the burden to establish the loans were made for a business purpose. Jansen v. Nu-W., Inc., 102 Wn. App. 432, 439, 6 P.3d 98 (2000) ("When a loan is usurious on its face, the burden is on the lender to show the business exception of RCW 19.52.080 applies."); see also Marashi v. Lannen, 55 Wn. App. 820, 823, 780 P.2d 1341 (1989) ("[T]he burden is on the lender to show the business exception applies.").

The determination of whether a loan was primarily for a business purpose within the meaning of RCW 19.52.080 is a mixed question of law and fact. Marashi, 55 Wn. App. at 826. We review the trial court's findings of fact for substantial evidence. Pardee

---

[4] In any action based on a usurious contract, if the borrower has paid interest under the contract, "the creditor shall only be entitled to the principal less twice the amount of the interest paid, and less the amount of all accrued and unpaid interest." RCW 19.52.030(1). Further, the "debtor shall be entitled to costs and reasonable attorneys' fees plus the amount by which the amount the debtor has paid under the contract exceeds the amount to which the creditor is entitled." RCW 19.52.030(1).

v. Jolly, 163 Wn.2d 558, 566, 182 P.3d 967 (2008). We view the evidence in the light most favorable to the prevailing party and defer to the trial court regarding witness credibility and persuasiveness of the evidence. Hegwine v. Longview Fibre Co., 132 Wn. App. 546, 556, 132 P.3d 789 (2006); Boeing Co. v. Heidy, 147 Wn.2d 78, 87, 51 P.3d 793 (2002). Unchallenged findings of fact are verities on appeal. In re Estate of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004). We review a trial court's conclusions of law de novo. Pardee, 163 Wn.2d at 566.

The stated purpose of the borrower for obtaining the loan is a question of fact, but whether that purpose constitutes a business purpose is a question of law decided by the court. Jansen, 102 Wn. App. at 439-41. In other words, while the fact finder "decides the factual question of what the parties understood the funds were going to be spent on," it is for the court to "decide as a matter of law whether the[ ] proposed expenditures constitute business purposes." Jansen, 102 Wn. App. at 441.

The court must examine "objective indications of purpose in determining the applicability of the 'business purpose' exemption." Brown v. Giger, 111 Wn.2d 76, 82 757 P.2d 523 (1988). The purpose of a loan "is principally established by the representations the borrower makes to the lender at the time the loan is procured." Brown, 111 Wn.2d at 82; Jansen, 102 Wn. App. at 439. "The lender's purpose for the loan, which almost always is a business purpose, is irrelevant." Aetna Fin. Co. v. Darwin, 38 Wn. App. 921, 928, 691 P.2d 581 (1984).

When the representations of the borrower are inconclusive, the documentary evidence is "more conclusive" of the purpose of the loan. Brown, 111 Wn.2d at 83; see also Jansen, 102 Wn. App. at 440 ("The documentary evidence carries more weight

than unsubstantiated claims of contrary oral representations."). A direct conflict in the evidence on the question of the purpose of the loan creates an issue for the trier of fact. Marashi, 55 Wn. App. at 824.

Key Development argues the "uncontroverted" testimony of Dahlby and Johnson established the loans to Carlson were for a business purpose. We defer to the trial court on credibility. Boeing Co., 147 Wn.2d at 87 ("It is the sole province of the trier of fact to pass on the weight and credibility of evidence."). The court must weigh not only the credibility of witnesses but also "the persuasiveness of the evidence." In re T.W.J., 193 Wn. App. 1, 8, 367 P.3d 607 (2016); Acord v. Pettit, 174 Wn. App. 95, 109, 302 P.3d 1265 (2013) (weight and persuasiveness of testimony are "matters for the judge trying the case").

The court found the testimony regarding Carlson's purpose for the loans was not determinative or convincing. Finding of fact 8 states:

> Testimony Regarding Business Purpose. Clyde does not recall that there ever was a conversation with Dahlby or Johnson in which he was asked or in which he stated his personal need or the purpose for the money. Johnson and Dahlby both testified that they understood there was a business purpose for the loan[s]. When the testimony of Mr. Johnson and Mr. Dahlby is considered, it is not a matter of not believing them or finding them not credible, but when their memories on other issues is listened to and considered it is very apparent that their memories are lacking. The events relating to the Loans occurred in 2000 and 2002, clearly Mr. Johnson and Mr. Dahlby have lots of difficulty remembering events that long ago. The oral testimony of Mr. Carlson, Mr. Johnson and Mr. Dahlby is not determinative of or convincing regarding the purpose of the funds at the inception of the Loans.

Carlson testified he did not recall discussing the purpose of the 2000 loan or the 2002 loan with Dahlby or Johnson. Carlson testified:

Q.    And do you recall having a conversation with either Mr. Dahlby or Mr. Johnson about the purpose of either of these loans?

10

A.    No, I don't recall.
Q.    . . . You don't recall the substance of the conversation, or you don't recall having a conversation?
A.    Well, I just – I don't recall having a conversation about it, no.

The record supports the court's finding that although Dahlby and Johnson testified Carlson said the loans were for his business, "when their memories on other issues is . . . considered it is very apparent that their memories are lacking. . . . [C]learly Mr. Johnson and Mr. Dahlby have lots of difficulty remembering events" in 2000 and 2002.

During cross-examination, Dahlby admitted that "at seventy years old," his memory was "not very good" and he needed to talk to Johnson to "refresh [his] memory of the events of the year 2000 and 2002." Dahlby could not remember the details of the 2002 loan he made to Carlson and had "no specific memory" of Carlson executing either promissory note.

Johnson could not remember any details about the business purpose for the 2002 loan and could not remember why he wrote the check for the 2002 loan on a corporate account rather than the Columbia Meat Products Pension Plan account.

Johnson also could not remember the details of the other pension fund loans. For example, the evidence showed Key Development made loans secured by a deed of trust to Terry and Sara French (collectively, French) in 2007 and in 2009. But Johnson could not remember when Key Development made the loan to French in 2007 and provided inconsistent explanations about the purpose of the loan. And Johnson could not remember any details regarding the 2009 loan to French. Johnson also testified he personally loaned money to French to purchase a boat but could not remember the amount of the loan or when French paid off the loan.

11

We defer to the credibility determination of the trial court and conclude the record supports finding the testimony of Johnson and Dahlby was "not determinative of or convincing" regarding the purpose of the loans.

The court also concluded the tax returns for Northwest Seaplanes Inc. were "not convincing or helpful in determining the purpose of the Loans." The court found the "fact that the loan repayment schedule coincided with the Corporation's best months" was "not persuasive as to the purpose of the Loans at their inception" because "those same months were also Mr. Carlson's best personal income months." The court found the fact that Carlson made loan payments using checks drawn on the account of his business did not establish the loans were business loans because "the Corporation was merely writing one check rather than writing a check to Mr. Carlson who in turn would write a check to Plaintiff."

Turning to the documentary evidence, the court found the objective terms of the promissory notes showed the 2000 and 2002 loans "appear to be personal loans." Finding of fact 13 states:

> The Objective Terms of the Promissory Notes. These Loans, based on the documentation, appear to be personal loans. Both the names of the parties, the lack of business security provided with them, the lack of any specific intent stated in the documents themselves and the fact the loan proceeds were payable personally to Mr. Carlson, indicate that they are personal loans.

The record supports the court's finding. Both promissory notes identify "Clyde E. Carlson and Priscilla A. Carlson" as the borrower and the obligation is "joint and several." The promissory note securing the $150,000 loan in 2000 states Carlson promises to pay G & G Meats Pension Fund. The promissory note in 2002 to secure the $150,000 loan promises to pay Columbia Meat Products Pension Plan. Neither

promissory note indicates the loan is for a business purpose. The checks Johnson wrote to Carlson for the two loans are payable only to "Clyde Carlson."

The unchallenged findings establish that because Key Development destroyed or returned loan documents after a loan was repaid, "the Court did not have the benefit of seeing how the Plaintiff documented other loans contemporaneously with the Carlson Loans." However, the findings state, "It is clear to this Court that the Plaintiff had the ability to document business loans." For example, the court notes that a loan to Lakeside Heating and Air Conditioning LLC "prepared by Plaintiff-Lender and its counsel . . . expressly provided in its documents that the 'loan evidenced by the note is for business purposes and the loan funds will be used solely for business purposes'."

The court also notes that in the promissory notes executed by Lakeside Heating and Air Conditioning LLC and Tonkka Trucking and Excavating LLC, "the Plaintiff-Lender identified the business entity as the borrower and the individuals as co-borrowers or guarantors."

The record shows Johnson made a loan to Lakeside Heating and Air Conditioning LLC in January 2004. The "AGREEMENT TO MAKE SECURED LOAN" lists the business's owners as guarantors of the loan[5] and requires both the business and the owners to represent the loan "evidenced by the note is for business purposes and the loan funds will be used solely for business purposes." The promissory note securing the January 2004 loan to Lakeside Heating and Air Conditioning LLC lists the

---

[5] The security agreement states in pertinent part:

Agreement made January 23, 2004, between Brandon S. Agostinelli and Linnea Agostinelli, husband and wife, . . . in this agreement referred to as guarantor, Lakeside Heating & Air Conditioning, LLC, . . . in this agreement referred to as debtor, and Jack A. Johnson . . . , in this agreement referred to as secured party.

business rather than its owners as the borrower.[6] The promissory note for a January 2008 loan Johnson made to Tonkka Trucking and Excavating LLC lists the business as well as its owner as the borrower.[7] The record supports the court finding that the documentary evidence related to the loans is "more indicative of a business loan than having only the individuals as the borrower, when the individuals also are the owners of a business."

Key Development contends the court erred in admitting evidence of the other loans and relying on that evidence to conclude it did not carry its burden of proving the business purpose exemption applied.

We review the admission of evidence for abuse of discretion. Univ. of Wash. Med. Ctr. v. Dep't of Health, 164 Wn.2d 95, 104, 187 P.3d 243 (2008). A trial court abuses its discretion if it bases its decision on "untenable grounds or untenable reasons." Kappelman v. Lutz, 167 Wn.2d 1, 6, 217 P.3d 286 (2009).

The court admitted promissory notes, deeds of trust, and other documents for loans Key Development made to individuals or businesses after making the loans to Carlson, exhibits 58, 59, 60, 61, 63, 64, 66, 67, and 68.[8] Key Development objected to

---

[6] The promissory note states in pertinent part:

FOR VALUE RECEIVED, LAKESIDE HEATING & AIR CONDITIONING, LLC, a Washington limited liability company ("Borrower" herein) promises to pay to the order of JACK A. JOHNSON . . . ('Lender" herein), the principal sum of TWO HUNDRED AND ONE THOUSAND and no/100 Dollars ($201,000.00) with interest thereon at the initial annual rate of ten percent (10%).

[7] The promissory note states in pertinent part:

FOR VALUE RECEIVED, Tonkka Trucking and Excavating, LLC, a Washington limited liability company and Benjamin Tanielian (collectively "Borrower" herein) promises to pay to the order of JACK A. JOHNSON . . ., ("lender' herein), the principal sum of SIXTY THREE THOUSAND and no/100 Dollars ($63,000.00) with interest thereon at the annual rate of fourteen percent (14%).

[8] Key Development also argues the court erred in admitting exhibit 65 but the court did not admit exhibit 65 into evidence.

14

the admission of the exhibits as not relevant. Carlson argued the exhibits were relevant to show Key Development had the ability to document business loans made on behalf of the pension fund and to impeach Johnson. The court admitted the exhibits "[f]or that limited purpose." The court ruled that "[w]hat weight will be allowed will be determined later."

For the first time on appeal, Key Development argues the exhibits were only admissible to show habit or routine practice under ER 406. We do not consider arguments raised for the first time on appeal. RAP 2.5(a); Heg v. Alldredge, 157 Wn.2d 154, 162, 137 P.3d 9 (2006); see Mears v. Bethel Sch. Dist. No. 403, 182 Wn. App. 919, 934, 332 P.3d 1077 (2014) (" 'A party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial.' ") (quoting State v. Guloy, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985). The court did not abuse its discretion in admitting and considering the exhibits.[9]

We conclude the court did not err in concluding Key Development did not carry its burden of establishing the business purpose exemption under RCW 19.52.080 applied to the two loans to Carlson.

In the alternative, Key Development relies on dicta in Brown and Stevens to argue that because Carlson was not " 'by adversity and necessity of economic life driven to borrow money at any cost,' " the usury statute does not apply. Brown, 111 Wn.2d at 80-81 (quoting Baske v. Russell, 67 Wn.2d 268, 273, 407 P.2d 434 (1965)). Brown and Stevens do not support Key Development's argument.

---

[9] "[T]he threshold to admit relevant evidence is low and even minimally relevant evidence is admissible." Kappelman, 167 Wn.2d at 9. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.

15

In Brown, the court addressed whether a loan was "properly characterized as personal in nature." Brown, 111 Wn.2d at 81. Because the borrower executed loan documents clearly stating the loan was for a business purpose, the Supreme Court held the trial court properly characterized the loan as having a business purpose. Brown, 111 Wn.2d at 82-83. The court noted in dicta that "nothing suggests that [the borrower] was 'by adversity and necessity . . . driven to borrow money at any cost.' " Brown, 111 Wn.2d at 83 (quoting Baske, 67 Wn.2d at 273).[10]

In Stevens, the court addressed whether the defendant lenders carried their burden of proving the loan was for a business purpose. Stevens, 53 Wn. App. at 515. The borrower in Stevens stated in the loan application that the loan was "for investment purposes" and signed an affidavit stating the loan proceeds "would be used for business rather than personal purposes." Stevens, 53 Wn. App. at 510-11. The court held the "objective manifestations were that the loan was for business purposes, and therefore the 'business purpose' exception applies." Stevens, 53 Wn. App. at 516. In dicta, the Stevens court states, "[N]othing suggests that Stevens was 'by adversity and necessity . . . driven to borrow money at any cost.' " Stevens, 53 Wn. App. at 517 (quoting Baske, 67 Wn.2d at 273).

The dicta in Brown and Stevens cannot contravene the plain language of the usury statute. Gerberding v. Munro, 134 Wn.2d 188, 224, 949 P.2d 1366 (1998) (Dicta is language not necessary to the decision and "need not be followed."). The plain and unambiguous language of chapter 19.52 RCW does not indicate in any way that the intent of the usury law is related to borrowers who are " 'by adversity and necessity . . .

---

[10] Some alteration in original.

driven to borrow money at any cost.' "[11] To the contrary, the stated purpose of the usury statute is "to protect the residents of this state from debts bearing burdensome interest rates" on consumer loans. RCW 19.52.005. A consumer loan is "primarily for personal, family, or household purposes." RCW 19.52.080.

We affirm the court's findings of fact and conclusions of law and entry of the judgment against Key Development.

Carlson requests attorney fees on appeal under RCW 4.84.330 and RAP 18.1. The 2000 and 2002 promissory notes each contain a unilateral attorney fee provision.[12] RCW 4.84.330 provides that where a contract contains a unilateral attorney fee provision, the prevailing party is entitled to fees. Wash. Fed. v. Gentry, 179 Wn. App. 470, 496, 319 P.3d 823 (2014). Upon compliance with RAP 18.1, Carlson is entitled to fees on appeal.

WE CONCUR:

---

[11] Brown, 111 Wn.2d at 83 (alteration in original) (quoting Baske, 67 Wn.2d at 273).

[12] Both promissory notes state, in pertinent part, "If this Note is placed in the hands of an attorney for collection after any default, Borrower promises to pay all costs of collection and a reasonable sum as attorneys' fees, whether suit is brought or not."

17